UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ELENA BROWN,

                                Plaintiff,

                -vs-                                                06-CV-688C(SC)

THE ST. PAUL TRAVELERS COMPANIES,

                                Defendant.
_____

## INTRODUCTION

Plaintiff filed an amended complaint in this action on March 20, 2007 (Item 5) alleging that defendant terminated her employment and discriminated against her based upon her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*  In lieu of an answer, defendant filed this motion seeking dismissal of the amended complaint and for an order compelling arbitration pursuant to Fed. R. Civ. P. 12(b) and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 - 16 (Item 9).  For the reasons that follow, the motion is granted, and the amended complaint is dismissed.

## BACKGROUND & FACTS

Plaintiff commenced her employment with Aetna Life and Casualty Company on November 2, 1966 (Item 16, ¶ 2).  In 1996, Aetna was bought by Travelers Insurance; and in 2004, Traveler's merged with the St. Paul Companies.  *Id.,* ¶ 3.  In April 1996, following the purchase of Aetna, Travelers issued a revised employee handbook to all employees. That handbook contained an updated version of the company's "Employment Arbitration

Policy."  It provides, in relevant part, that arbitration is "the required, and exclusive, forum for the resolution of all employment disputes based on legally protected rights," including claims under Title VII, the ADEA, the Americans with Disabilities Act ("ADA"), the Employee Retirement Income Security Act of 1974 ("ERISA"), "and any other federal, state or local statute, regulation or common law doctrine, regarding employment discrimination, conditions of employment or termination of employment." (Item 9, Exh. C.)  The handbook was revised in 1998, 2001, 2002, 2003, and 2004.  In an affidavit, Diane Bengston, Senior Vice President for Human Resources for Travelers, stated that updated versions of the handbook, each containing the arbitration policy, were distributed to all employees via interoffice mail each time the handbook was revised (Item 9, Bengston Affidavit, ¶¶ 9-13). Additionally, on April 5, 2004, an e-mail was sent to all employees regarding various company employment policies, including the arbitration policy.  In the e-mail, John Clifford, Senior Vice President for Human Resources, advised all employees that it was their responsibility "to read and understand" all of the company employment policies.  *Id.,* ¶ 14. Further, the e-mail provided that the agreement to abide by these policies was "an express condition" of continuing employment.  *Id.*  Plaintiff states that she has no recollection or record of receiving an employee handbook and arbitration policy (Item 16, ¶ 14).

In July 2004, plaintiff was advised that her position was to be eliminated due to a lack of work.  *Id.,* ¶ 10.  On August 24, 2004, plaintiff signed a Confidential Separation Agreement (Item 16, Exh. A).  In exchange for receiving $54,650.00 in severance pay and outplacement services, plaintiff signed a general waiver and release of all "claims, demands, actions, liabilities, suits, or causes of action, at law or equity . . ." including claims under the ADEA, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities

2

Act, and the Family and Medical Leave Act.  *Id.,* § IV (A)(1), (2).  Section IV(A)(3) of the Separation Agreement makes reference to an accompanying "schedule," yet defendant admits that it has not been able to locate an original or copy of the schedule, which contains certain demographic information required by the Older Workers Benefit Protection Act ("OWBPA").  The Separation Agreement also provides that "any and all disputes arising out of or relating in any way to the validity, interpretation or enforcement of this Agreement shall be resolved through binding arbitration . . . ." *Id.,* § V(C).

## DISCUSSION

The federal policy favoring arbitration is well established.  *See Gilmer v. Interstate/Johnson Lane Corporation*, 500 U.S. 20, 24 (1991); *Desiderio v. National Association of Securities Dealers, Inc.,* 191 F.3d 198, 203-04 (2d Cir. 1999), *cert. denied,* 531 U.S. 1069 (2001).  Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  When faced with a motion to compel arbitration under the FAA, the court must assess the following factors: (1) whether the parties agreed to arbitrate; (2) whether the parties' claims fall within the scope of the agreement; and (3) if federal statutory claims are at issue, whether Congress intended those claims to be non-arbitrable.  *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987); *see also Arakawa v. Japan Network Group*, 56 F. Supp. 2d 349, 352 (S.D.N.Y. 1999).  The only factor at issue in this case is whether the parties agreed to arbitrate

"[T]he summary judgment standard is appropriate in cases where the District Court

is required to determine arbitrability," regardless of how the party that favors arbitration styles its motion.  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *see also Santos v. GE Capital,* 397 F. Supp. 2d 350, 353 (D.Conn. 2005) ("When a motion to dismiss is premised upon a request to compel arbitration, . . . the Court 'applies a standard similar to that applicable for a motion for summary judgment.'") (quoting *Bensadoun*, 316 F.3d at 175).  Accordingly, with respect to the question of arbitrability, defendants must "show that there is no genuine issue as to any material fact and that [they are] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

With respect to the first factor, courts employ "ordinary principles of contract and agency" in order to determine whether the parties have agreed to arbitrate.  *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776-77 (2d Cir. 1995).  A party generally will be held to a signed contract unless he can demonstrate special circumstances, such as duress or coercion, that contradict his intent to be bound.  *See Arakawa*, 56 F. Supp. 2d at 352 (applying New York law).  Here, had plaintiff signed an acknowledgment of receipt of the handbook and arbitration policy, she clearly would have evinced an intention to be bound by the agreement.  However, the FAA does not require that the parties sign a written acknowledgment of an arbitration agreement; it mandates only that the agreement itself be in writing.  *See* 9 U.S.C. § 3; *see also Gonzalez v. Toscorp Inc.*, 1999 WL 595632, at *2 (S.D.N.Y. August 5, 1999) (citing cases).  It is well settled that a non-signatory party may be subject to an arbitration agreement if her subsequent conduct indicates that she has assumed the obligation to arbitrate. *See Thomson*, 64 F.3d at 777.

In *Gonzales,* the court held that the plaintiff was subject to the company's arbitration

4

policy, distributed to employees along with a copy of the company's handbook, despite the fact that the plaintiff did not sign the required receipt form.  *See Gonzales*, 1999 WL 595632 at *1-3.  The court found that the plaintiff assumed the obligation to arbitrate when, having been advised that the arbitration policy was a condition of continued employment, he continued his employment with the company past the effective date of the policy.  *Id*. at *2; *see also Genesco,* 815 F.2d at 846 (finding that plaintiff agreed to arbitrate with defendant under both signed and unsigned agreements); *Bishop v. Smith Barney, Inc.*, 1998 WL 50210, at *5 (S.D.N.Y. February 6, 1998) (holding that unsigned arbitration agreement was binding under the FAA and indicating that plaintiff's conduct demonstrated an obligation to arbitrate).  Here, while there is no signed acknowledgment of plaintiff's receipt of the handbook, the arbitration policy is a written policy, plaintiff was advised that compliance with the arbitration policy was a condition of continued employment, she was advised that it was her responsibility to "read and understand" all of the company policies including the arbitration policy, and she continued her employment with defendant. "[W]hen an arbitration policy is a condition of employment, . . . an employee 'will be deemed to have accepted' an arbitration agreement when she continues to work after the promulgation of the arbitration policy."  *Beletsis v. Credit Suisse First Boston, Corp.,* 2002 WL 2031610, *3 (S.D.N.Y. September 4, 2002) (citing *Chanchani v. Salomon/Smith Barney, Inc.,* 2001 WL 204214, *3 (S.D.N.Y. March 1, 2001).  Plaintiff's statement, that she has no recollection or record of receiving the employee handbook and arbitration policy, despite the fact that it was distributed on at least six occasions during her employment, is thus not sufficient to raise a genuine issue of material fact.

Plaintiff also argues that language in the employee handbook, providing that the handbook does not constitute an express or implied contract of employment or that the arbitration policy may be amended, renders the arbitration policy unenforceable.  This argument is without merit.  The cases cited by plaintiff in which the employee handbook containing the arbitration policy explicitly stated that it did not "create contractual obligations of any kind," *see U.S. ex rel. Harris v. EPS, Inc.,* 2006 WL 1348173, *5 (D.Vt. May 16, 2006), where a signed offer letter made no mention of the arbitration policy, *see Whitaker v. Clear Channel Broadcasting, Inc.,* 2005 WL 3478352 (D.Conn. December 19, 2005), or where there was no clear, distinct, and mandatory arbitration policy in the employee handbook, *see Sherry v. Sisters of Charity Med. Ctr.*, 1999 WL 287738 (E.D.N.Y. May 4, 1999), are clearly distinguishable on their facts.  Here, the language of the arbitration policy is distinct and mandatory.  Plaintiff was advised of the policy and that compliance with it was a condition of employment, even if she has no recollection of receiving the employee handbook.  Finally, language in the employee handbook to the effect that it does not create a contract of employment does not render the arbitration policy unenforceable.  The employee handbook in this case does not contain the same disclaiming language as was present in *Harris* and which led that court to conclude that the arbitration agreement had no legal effect.[1]

---

[1]  Even if the court had found the arbitration agreement unenforceable, plaintiff would nonetheless be bound by the arbitration provision in the Confidential Separation Agreement that she signed in August 2004.  That agreement provides that "any and all disputes arising out of or relating in any way to the validity, interpretation or enforcement of this Agreement shall be resolved through binding arbitration . . ." (Item 16, Exh. A, § V(C).  The alleged failure of the defendant to comply with the OWBPA would not render the entire agreement unenforceable.  Rather, under the terms of the Separation Agreement, the validity of the plaintiff's release of her ADEA claim and defendant's compliance with the OWBPA are both issues subject to arbitration, as is the defendant's claim for restitution, recoupment, or setoff against plaintiff as an issue "arising out of" the Separation Agreement.  *See Oubre v. Entergy Operations, Inc.*,

**CONCLUSION**

The defendant's motion to dismiss the amended complaint and to compel arbitration is granted, and the complaint is dismissed.  The Clerk is directed to enter judgment for defendant.

So ordered.

_____\s\ John T. Curtin_____
JOHN T. CURTIN
United States District Judge

Dated:    May    30    , 2008
p:\opinions\06-688.may808

---

522 U.S. 422, 426 (1998) (in further proceedings, court may need to inquire whether employer has claims for restitution, recoupment, or setoff).

7